## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

MICHAEL REGER; and
MLR HOLDINGS 2020, LLC,
a Florida limited liability company,

        Plaintiffs,

    v.

ALL THINGS GEL, LLC, a Florida
limited liability company, GELTECH LABS
CORPORATION, a Florida Corporation, ATG
LABORATORIES CORP, a Florida Corporation,
DYNO TECH LABORATORIES CORP, a
Florida Corporation, DYNOMAT INC., a Florida
Corporation, WHALE TANK VENTURES INC,
a Florida Corporation, LOGAN'S WIPE MAGIC
INC, FIREICE GEL, LLC, a Florida limited
liability company, and Individually, PETER J.
CORDANI, LOGAN CORDANI and MARK
DANIELS.

        Defendants.

Case No.

**JURY TRIAL DEMANDED**

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

The Plaintiffs, Michael Reger ("Mr. Reger") and MLR Holdings 2020, LLC ("MLR"),

(collectively "Plaintiffs"), by and through their undersigned counsel, hereby bring this Complaint

against the Defendants, All Things Gel, LLC ("ATG"), ATG Laboratories Corp ("ATG Labs")

GelTech Labs Corporation ("GTL"), Dyno Tech Laboratories Corp ("Dyno Labs"), Dynomat Inc.

("Dynomat Inc."),Whale Tank Ventures Inc ("Whale"), Logan's Wipe Magic Inc ("LWM") Peter

J. Cordani ("Mr. Cordani"), Logan Cordani ("L. Cordani"), and Mark Daniels ("Mr. Daniels"),

(collectively "Defendants"), and allege as follows:

## NATURE OF THE ACTION

Defendant Peter Cordani was the Chief Technology Officer ("CTO") and a board member of GelTech Solutions, Inc ("Geltech") since the company's inception in 2007, and he served as Geltech's Chief Executive Officer from 2014 until 2018.  Geltech, a publicly traded company, was a leading fire suppression technology provider that invested in rigorous research, testing and certifications, including to meet criteria established by the U.S. Forest Service, Underwriters Laboratories, and the Food and Drug Administration and other highly regulated local and state government agencies.

To protect itself and its valuable product lines, Geltech entered into an Employment Agreement with Mr. Cordani. The Employment Agreement specifically provided that Mr. Cordani would assign all inventions he created to Geltech; further, and more importantly, Mr. Cordani agreed to keep all of the proprietary formulations, customer lists, and technical information confidential, and to refrain from soliciting Geltech's customers or competing with Geltech for one year after termination of his employment.

As CTO and the lead inventor, Mr. Cordani knew how the Geltech products were made, which companies supplied raw materials, how the products were marketed, what certifications were required, and who the customers were. He knew what molecular size was required to create effective products for the various product lines. He knew *everything.*

In January 2020, Geltech entered into a Settlement Agreement with Michael Reger, its secured lender and former Chairman of the Board and Chief Executive Officer, pursuant to which Geltech assigned all of its assets, including its intellectual property, to Mr. Reger in consideration for a release of the debt it owed Mr. Reger.

Seeing that Geltech would be reborn as a new company under Mr. Reger, Mr. Cordani made plans to leave. With the help of other soon-to-be-ex-Geltech employees, Mr. Cordani stashed away Geltech's products in various locations outside of Geltech's facilities and created copies of Geltech's confidential information, including Geltech's customer and vendor lists. Mr. Cordani then exploited the property he stole from Geltech, claiming it was his own, and capitalized on his well-known association with Geltech to raise significant capital, including more than $250,000 from one unexpecting investor alone.

With his cache of stolen Geltech property and investment money, Mr. Cordani left Geltech in 2020 to create a replica business, All Things Gel, LLC ("ATG"). He used the same suppliers, the same product offerings, the same advertisements, and the same customer lists. He leased space in Geltech's former warehouse and hung up Geltech's product posters in the conference room, which of course depicted Geltech's products and trademarks. Potential investors and customers would visit the ATG offices, in the exact spot where Geltech had been located, with Geltech posters on the walls, and be presented with product offerings in nearly identical packaging, with extraordinarily similar names, as to those offered by Geltech. The confusion was deliberate.

Not only did Mr. Cordani create an imposter company, he created imposter certifications, advertising that his products have the same certifications as the Geltech products; of course, they do not – nor could they, given that these certifications require years to obtain. Perhaps most shockingly, on at least one occasion, he told a customer that his new company *was* Geltech, just under a new name.

 Mr. Cordani's dishonest and anticompetitive actions break every intellectual property rule in the book. He has violated his employment agreement, stolen numerous trade secrets, made false claims about his products that are material to purchasing decisions, used infringing trademarks,

and displayed copyright-protected posters. Plaintiffs file this action seeking an injunction and damages for Mr. Cordani's theft of trade secrets, trademark infringement, unfair competition, copyright infringement, breach of employment agreement, and breach of fiduciary duty.

## THE PARTIES

1.      Michael Reger is an individual over the age of eighteen (18), and resides in Palm Beach County, Florida.

2.      MLR Holdings 2020, LLC is a Florida limited liability Company with its principal place of business in Palm Beach County, Florida.

3.      All Things Gel, LLC is a Florida limited liability company with its principal place of business listed at 1460 Park Lane S., Suite 3, Jupiter, Florida  33458.

4.      GelTech Labs Corporation is a Florida Corporation with its principal place of business listed at 1460 Park Lane S., Suite 3, Jupiter, Florida  33458.

5.      ATG Laboratories Corp is a Florida Corporation with its principal place of business listed at 1460 Park Lane S., Suite 3, Jupiter, Florida  33458

6.      Dyno Tech Laboratories is a Florida Corporation with its principal place of business listed at 1460 Park Lane S., Suite 3, Jupiter, Florida  33458.

7.      Dynomat Inc. is a Florida Corporation with its principal place of business listed at 1460 Park Lane S., Suite 3, Jupiter, Florida  33458.

8.      Whale Tank Ventures Inc is a Florida Corporation with its principal place of business listed at 266 Rudder Cay Way, Jupiter, Florida  33458.

9.      Logan's Wipe Magic Inc. is a Florida Corporation with its principal place of business listed at 266 Rudder Cay Way, Jupiter, Florida  33458.

10.     FireIce Gel, LLC is a Florida Corporation with its principal place of business listed at 1460 Park Lane S., Suite 3, Jupiter, Florida  33458.

11.     Peter J. Cordani is an individual over the age of eighteen (18), and upon information and belief, resides in Palm Beach County, Florida.

12.     Logan Cordani is an individual over the age of eighteen (18), and upon information and belief, resides in Palm Beach County, Florida.

13.     Mark Daniels is an individual over the age of eighteen (18), and upon information and belief, resides in Palm Beach County, Florida.

<u>**JURISDICTION AND VENUE**</u>

14.     This Court has personal jurisdiction over the Defendants because all the Defendants are residents of Florida and conduct business in Florida.

15.     This Court has subject matter jurisdiction over the Plaintiffs' claims pursuant to Section 39 of the Lanham Act, 15 U.S.C § 1121(a) and 28 U.S.C. § 1331.

16.     Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b) because ATG and GTL have their principal place of business in Palm Beach County, Florida, and a substantial part of the events giving rise to the claims occurred in Palm Beach County, Florida.

<u>**GENERAL ALLEGATIONS**</u>

*I.*     *FACTUAL BACKGROUND*

17.     GelTech Solutions, Inc. a Delaware Corporation ("Geltech") is a product innovation company that at one point specialized in environmentally friendly chemicals and products associated with fighting fire, protecting assets, and water retention throughout the world.

18.     Geltech sold four main product lines: FIREICE - a line of fire suppression and fire-retardant products and the equipment used for their varied applications; FIREICE SHIELD- a line

of asset protection products including welding blankets; SOIL2O Dust Control products, and SOIL2O - a line of agricultural moisture retention products, including SOIL2O Topical and SOIL2O Granular.

19.     These products were mainly used for agriculture, landscaping, fire protection, firefighting, and residential purposes.

20.     These products were, and continue to be, recognized throughout the world as highly innovative.

21.     To further the goals of the company, Geltech hired employees to create and innovate products. One such employee was Peter J. Cordani. On November 15, 2012, Geltech and Mr. Cordani entered into an Employment Agreement. A copy of the Employment Agreement is attached as **Exhibit "A"**. Mr. Cordani was to serve as the CTO of the Company.

22.     The Employment Agreement established, in pertinent part to this action, that:

   a.   Geltech had acquired and developed certain trade secrets that it sought to protect.

   b.   Mr. Cordani was restricted from competing against Geltech and soliciting its customers.

   c.   Mr. Cordani was to protect Geltech's confidential information and keep it confidential.

   d.   All inventions, ideas, processes, programs, software, and designs (including all improvements) conceived or made by Mr. Cordani during the course of his employment with Geltech was the sole and exclusive property of Geltech.

   e.   All Confidential Information, including trademarks, trade secrets, and other intellectual property was to be the exclusive property of Geltech.

f.  Mr. Cordani was strictly prohibited from copying or removing any of the named and identified exclusive property belonging to Geltech, which all of which became the property of Mr. Reger pursuant to the January 2020 Settlement Agreement.

23.  As part of Mr. Cordani's employment, he had contact with utility companies and manufacturing companies throughout the world regarding the production and use of Geltech Product and therefore had an in-depth knowledge of both Geltech's customers and its vendors.

24.  Over the years, Geltech developed and/or obtained valuable intellectual property, including numerous trade secrets, trademarks, patents, copyrights, and testing certifications and approvals ("Intellectual Property").

25.  Geltech filed numerous trademarks, including "FireIce" and "GelTech Solutions."

26.  Specifically, Geltech obtained at least 23 patents and applied for at least an additional 33 patents, owned at least eleven registered trademarks, created creative works of advertising, and had innumerable trade secrets including, but not limited to, its FIREICE and SOIL2O products' formulas and compilations, its supplier information, and its customer list.

27.  Geltech invested a tremendous amount of time, energy, and money in not just creating its products, but also submitted them to various companies and agencies to perform rigorous testing to ultimately obtain certifications and approvals.

28.  For example, Geltech submitted its FIREICE products for testing with the United States Department of Agriculture, Forest Service, National Technology and Development Program ("U.S. Forest Service"). Geltech's testing of its FIREICE products with the U.S. Forest Service cost more than $100,000 for each product tested and took almost two years to obtain final approval for each of its products to be listed on the available Qualified Product List ("QPL").

29.     Tellingly, products claimed to be tested by ATG are not listed on the publicly available QPL, meaning they were never so tested and approved.

30.     Furthermore, an inquiry was made to the U.S. Forest Service. The Program Manager of the Wildland Fire Chemical Systems, Mrs. Shirley Zystra, confirmed that ATG had never submitted the FireStorm product for testing, and is in fact not listed on QPL and cannot be used on Federal lands.

31.     Mr. Cordani was aware of Geltech's Intellectual Property as he was its Chief Technology Officer and was involved in some of the development of products, including knowledge of the raw material suppliers and the proprietary formulas developed by those suppliers.

32.     Mr. Cordani also had intimate knowledge of all of Geltech's customers and vendors, including access to Geltech's address books and lists.

33.     As a result of liquidity issues, Geltech eventually borrowed funds from Mr. Reger, a private lender.

34.     By 2020, Geltech's liability to Mr. Reger was approximately Seven Million Dollars ($7,000,000) of secured convertible debt.

35.     On January 31, 2020, Geltech and Mr. Reger entered into a settlement and assignment agreement in which Geltech agreed to assign and transfer all of its assets, including its contract rights, intangibles, and intellectual property to Mr. Reger in consideration for Mr. Reger releasing Geltech from any liability related to the debt owed to Mr. Reger ("Settlement Agreement"). A copy of the Form 8-K filing acknowledging the Settlement Agreement is attached hereto as **Exhibit "B"**.

36.     Subsequent to the execution of the Settlement Agreement, the assignment of Geltech's patents and trademarks to Mr. Reger was recorded with the United States Patent and Trademark Office.

37.     Accordingly, in exchange for releasing Geltech's debt, Mr. Reger acquired all of Geltech's assets, which includes, but is not limited to, the aforementioned contract rights and Intellectual Property ("Reger Settlement").

38.     Mr. Reger thereafter opened a new business, MLR Holdings 2020, LLC ("MLR").

39.     MLR now operates as "Geltech" and manufactures, markets, and sells the same products that Geltech had sold, including the popular products sold under the federally registered FIREICE, GelTech Solution and SOIL$_2$O trademarks.

## II.     DEFENDANTS' DECEIT

40.     Shortly after Geltech entered into the Settlement Agreement with Mr. Reger, Mr. Cordani left his employment with Geltech and formed All Things Gel, LLC (which does business as "ATG") and GelTech Labs Corporation (which does business as "GTL"), with the cooperation and assistance of Mr. Daniels.

41.     Specifically, ATG was formed by Mr. Cordani on April 29, 2020, with Mr. Cordani as its sole officer. Mr. Cordani filed Articles of Dissolution and voluntarily dissolved ATG on June 17, 2021, a mere seven (7) days after the Plaintiffs filed their original Complaint against ATG, but it is unclear whether ATG has actually ceased any operations.

42.     As of the date of filing this Complaint, ATG's website remains active and continues to advertise and sell products.

43.     GTL was formed on April 7, 2020, with Mr. Cordani as its CEO and remains an active entity.  Mr. Daniels is the incorporator and President of GTL.

44.     ATG and GTL share the same office and have the same principal address. Mr. Cordani is an authorized agent for both ATG and GTL, and upon information and belief, both ATG and GTL are owned and controlled by Mr. Cordani.

45.     ATG and GTL sell fire suppression equipment that is identical to the Geltech products developed by Geltech and now sold by MLR.

46.     Indeed, the sole purpose of Mr. Cordani's new companies is to compete against MLR. Mr. Cordani, Mr. Daniels, ATG, and GTL have employed numerous tactics to "copy and paste" the Geltech business, discussed in detail below.

## THEFT OF CUSTOMER LISTS

47.     Geltech maintained an address book that was kept confidential.

48.     Prior to departing Geltech, Mr. Cordani caused a Geltech employee to download Geltech's entire electronic address book to be duplicated for Mr. Cordani. This address book included *all* of Geltech's contacts, including its customers and suppliers.

49.     Defendants then used the address book to call Geltech's customers to market the products of ATG and GTL, and to invite them to an "open house" hosted by Defendants. Even if Defendants had developed their own products to sell, the theft and use of this customer list violated Mr. Cordani's employment agreement and constituted theft of trade secrets, identified as an exclusive property of Geltech transferred to Mr. Reger under the Settlement Agreement

## THEFT OF SUPPLIER

50.     In 2016, Geltech engaged a manufacturer ("the Manufacturer") to develop proprietary raw polymers for use in its fire suppression products. The identity of the manufacturer is a trade secret, and therefore is not disclosed in this pleading.

51.     The Manufacturer's agreement with Geltech prohibited the Manufacturer from providing the propriety products, or disclosing the technology behind the propriety products, to any competitor.

52.     The Manufacturer's agreement with Geltech inured to the benefit of, and was binding on, Geltech's successors, which is now Mr. Reger.

53.     The Manufacturer did create proprietary formulas for Geltech, including the formulas that became the basis of the FIREICE and SOIL$_2$O products.

54.     Subsequent to leaving Geltech, Mr. Cordani and/or the other Defendants contacted the Manufacturer and placed orders for products using proprietary technology owned by Geltech (and now by Mr. Reger) that are directly competitive to the proprietary FIREICE and SOIL$_2$O products.

55.     Prior to the Agreement with the Manufacturer, Geltech had used this manufacturer as the single and sole supplier of the polymer used in the FIREICE and SOIL$_2$O products.

56.     There were less than a handful of employees who had available to them the formulation, and specification for micron size utilized for each of the products; one of these persons was Mr. Cordani.

57.     Mr. Cordani would add to the formulation, including stabilizing material, and other propriety chemical components in order to obtain the desired viscosity for each one of the Geltech products.   In essence, Mr. Cordani, as CTO of Geltech, was in charge of quality control for each of the Geltech products and intimately knew each and every formulation and variation of such formulation and design of each of the products.

58.     He worked closely with the Purchasing Agent of Geltech to order and create the same exact formulation for quality assurance and product efficacy.

59.     The Purchasing Agent was subsequently hired by Cordani to work for him and place orders with the Manufacturer using the same specifications that were used in both FIREICE and SOIL$_2$O.

## THEFT OF PRODUCT

60.     Prior to departing Geltech, Mr. Cordani stole a substantial quantity of Geltech's products from the Geltech warehouse.

61.     He secreted the product in various warehouses, trailers and even residential dwellings owned by Mr. Cordani and his mother.

62.     He stole and stored these products so he could use these assets in his new companies, ATG and GTL.

63.     The accounting of these secreted assets was never disclosed to Mr. Reger or Geltech. This theft created liability to Geltech for conversion, which was assigned to Mr. Reger in the Settlement Agreement.

64.     Prior to opening ATG and GTL, Mr. Cordani accessed the stolen Geltech products and removed the labels from them, and placed labels for "FIRESTORM" on them.

## THEFT OF TRADEMARKS

65.     The trademarks owned by Mr. Reger, and licensed by MLR, include "SOIL2O" under Reg. No. 85356619, "FIREICE," under Reg. No 3429533, and "GELTECH SOLUTIONS," under Reg. No. 3503586 (collectively "Trademarks").

66.     Mr. Cordani and Mr. Daniels are aware of the Trademarks.

67.     Indeed, Mr. Cordani attempted to license the Trademarks and Patents from Mr. Reger, but Mr. Reger rejected, and did not license the Trademarks nor the Patents to Mr. Cordani.

68.    The proposed license agreement provided by Mr. Cordani and his associates, acknowledged, and stated, that the licensor is the exclusive owner of trade names, trademarks, and product marks Mr. Reger acquired under the Settlement Agreement.

69.    During this time, Mr. Daniels was advising Mr. Cordani, and was aware that neither he nor Mr. Cordani had any legal rights to the Trademarks.  Mr. Daniels was present with Mr. Cordani and his legal counsel, and Mr. Reger's legal counsel to discuss a potential license agreement.  When asked about Daniels' presence at the meeting, Mr. Reger's legal counsel was told that Mr. Daniels was an advisor to Mr. Cordani for these matters.

70.    Defendants' inventory consists entirely of (1) product stolen from Geltech, and (2) product ordered from the Manufacturer. Thus, Defendants' products are sold in packaging that has an identical size, shape, color, and handle to the corresponding products sold by MLR.

71.    Defendants named the FIREICE-competitive product "FIRESTORM" and used the same black and red coloring used by MLR.

72.    Defendants named the SOIL2O-competitive product "SOIL MD" and used the same green coloring used by MLR.

73.    Use of the mark "GELTECH LABS" is also clearly intended to evoke the "Geltech Solutions" name.

74.    Standing each of the products side-by-side, a consumer would find it very difficult to distinguish them.

75.    Use of similar names on identical packaging and/ or an identical business is intended to, and likely will, cause consumer confusion.

## THEFT OF ADVERTISING

76.     Geltech developed marketing collateral for its products. This collateral included product posters ("Geltech Posters"), which were displayed in Geltech's conference room.

77.     These Geltech Posters prominently displayed the FIREICE trademark.

78.     After the dissolution of Geltech, Mr. Cordani leased the exact same warehouse space where Geltech had its principal place of business.

79.     Mr. Cordani hung the Geltech Posters in his new conference room, in Geltech's old space.



80.     Using the stolen client list, Mr. Cordani and ATG invited Geltech's customers to Geltech's former space for an open house, where they were presented with posters showing visual images of Geltech's products, and where Mr. Cordani presented product samples that were stolen Geltech products.

81.     The copyright registrations owned by Mr. Reger, and licensed by MLR include at least one poster presented to customers and registered under Reg. No. VA 2-319-511, with an effective date of registration of September 22, 2022.



82. By putting up posters bearing Plaintiffs' trademark and displaying products that were visual replicas of Plaintiffs' products, Defendants intended to, and did mislead consumers into believing that Defendants were affiliated with Mr. Reger and/or MLR.

83. At all times material, Defendants Mr. Cordani and Mr. Daniels directed, controlled, authorized, ratified, and/or participated in the infringement of Plaintiff's Trademarks.

# FALSE STATEMENTS

## *FALSE SUCCESSOR STATEMENTS*

84.     In an attempt to deceive others, Defendants have falsely claimed to customers of Mr. Reger and MLR, including previous customers of Geltech, that ATG is the successor to Geltech and that ATG products have the same licensing and testing certifications as the Geltech Products now owned and licensed by Mr. Reger and MLR.

85.     Defendants Mr. Cordani and ATG have represented to customers of Mr. Reger and MLR that ATG was "formally Geltech Solutions."

86.     As a result, Defendants Mr. Cordani and ATG have confused and deceived consumers, and diverted their business to ATG.

87.     In one instance, MLR received an order from a customer, and the product was readied for pickup.  The customer never came to pick up the product.

88.     When MLR inquired, the customer said that it had already picked up the product and paid ATG. ATG had advised the customer that ATG was formerly Geltech Solutions.

89.      Not only is this an issue of consumer confusion, but worse, the consumer purchased uncertified, untested soil products, which creates an environmental safety hazard with the potential to harm waterways, people and animals.

## *FALSE CUSTOMER STATEMENTS*

90.     ATG publishes "customer testimonials" on its website.

91.     These testimonials purport to be from at least four customers of ATG.

92.     Upon information and belief, some or all of these testimonials are fabricated.

## *FALSE CERTIFICATION STATEMENTS*

93.     Additionally, Defendants hosted demonstrations, created YouTube videos, and provided testimonials falsely claiming that ATG products have the same claimed efficacy, third-party testing, and licenses as that of the former Geltech products now owned and licensed by Mr. Reger and MLR.

94.     These deceptive advertisements and practices create a life and health safety issue to consumers and the public at large because the testing and certifications claimed by Defendants are untrue. These false claims lead consumers to believe that these life safety products have been proven to work through testing by neutral third-party entities and/or the public organizations identified, such as the U.S. Forest Service and UL.

## *FALSE UL CERTIFICATION*

95.     Knowing they lack the testing certifications they claim they have, Mr. Cordani and ATG attempted to steal the UL listing for FIREICE products by having it transferred to ATG.

96.     Mr. Cordani and ATG's representative advised UL that ATG "is the same CEO and same office location in Florida" as Geltech.  When UL requested authorization from their listed contact with Geltech, Mr. Cordani knew the fraudulent scheme was up and failed to respond to UL's emails to effectuate the transfer.

97.     Defendants do not presently have a UL certification on any of their products.

98.     Companies that are in highly regulated areas are required to follow strict Fire Code regulations. For example, under certain Municipal Fires Codes, only UL extinguishers can be used. Mr. Cordani and ATG's false claims that their extinguisher is UL rated places the public's safety at risk and could potentially cost the consumer thousands of dollars in fines or even subject them to litigation in the event the ATG extinguisher fails to perform.

99.    ATG's Website currently lists its "FIRESTORM" XT Suppression Aerosol as passing UL equivalent tests. The website reads as follows:

**Compliance & Suppression Ratings**

- Agent has passed custom UL 711-40A Listing Equivalent testing. FIRESTORM XT ™ is compliant with DOT 20 DSC M5749, and contains no CFCs or VOCs per EPA & California Air Resources Board.

100.    This is false. No UL testing or equivalent testing has been done on the "FIRESTORM" products.

101.    ATG's wording is directly lifted off the website of Geltech for substantially the same product, with the same labeling and same container.

102.    ATG also has a brochure about its "FIRESTORM XT" 20 oz Aerosol, which provides nearly identical repesentations as those for the FIREICE XT 20 oz Aerosol.

103.    This brochure includes the false claim that the product has passed UL conformity testing:



***FALSE CLAIM OF PROTECTION UP TO 5,000°F***

104.    ATG states that its "FIRESTORM XT" 20 oz Aerosol "utilizes the same powerful suppression agent as contained in the [*sic*] making it capable of containing a fire up to 5,000°F."

105.    ATG could not even plagerise Geltech's materials  accurately, and failed to state what the suppression agent is comparable to.

106.    The Geltech brochure for its FIREICE XT 20 oz Aerosol states that it "utilizes the same powerful suppression agent as contained in the FireIce® UL-Listed Extinguisher, making it capable of containing a fire up to 5,000°F."

107.    At a minimum, the statement in the ATG brochure about "FIRESTORM XT" 20 oz Aerosol's agent protecting up to 5,000°F is misleading.

108.    Upon information and belief, the claim about "FIRESTORM XT" 20 oz Aerosol's agent protecting up to 5,000°F is literally false.

109.    Unlike the "FIRESTORM XT" product, Mr. Reger's FIREICE XT suppression agent has passed UL-Listing Equivalent testing.

110.    Mr. Cordani's statements in the ATG brochure mislead consumers that its agent is somehow comparable to something contained in something else, presumably a UL-Listed Extinguisher (which it is not), and therefore is capable of containing a fire up to 5,000°F.

111.    Mr. Cordani and ATG are making false and misleading statements to consumers about "FIRESTORM XT" 20 oz Aerosol's agent to deceive them about the product's safety and reliability.

112.    These certifications are critical to consumer's decisions to purchase these products; indeed, many agencies have policies in place that require these certifications as a prerequisite to purchase.

### *FALSE CLAIM OF FIRE SUPPRESSION RATINGS*

113.    Mr. Cordani and ATG further claim its "Agent has passed custom UL 711-40A Listing Equivalent testing."

114.    This is another example of Defendants' fraudulent use of the rigorous UL testing standards and certifications to bolster their product's creditability and engender trust in consumers when selecting a product.

115.    On UL's website, in the about section, it claims that "as the global safety science leader, UL helps companies to demonstrate safety, enhance sustainability, strengthen security, deliver quality, manage risk and achieve regulatory compliance." These are the benefits to products that go through its testing and certification process.

116.     Further, under product certification on its website, UL states that "our certifications demonstrate that your products have been tested to applicable standards. UL's recognized regulatory expertise provides critical creditability to authorities and the marketplace. Bring your products to market more efficiently and clearly differentiate them on crowded shelves with certification from the safety science leader."

117.     Upon information and belief, "FIRESTORM XT" has not been UL tested, approved, or obtained certification.

118.     Upon information and belief, the agent in "FIRESTORM XT" has not been UL tested, approved, or obtained certification.

119.      The statement that its "Agent has passed custom UL 711-40A Listing Equivalent testing" is intentionally misleading.

120.     Upon information and belief, the statement that its "Agent has passed custom UL 711-40A Listing Equivalent testing" is literally false.

121.     On the other hand, the suppression agent in Mr. Reger's FIREICE product has undergone UL testing, and has obtained UL certification. The UL file number is EX26444, and model number is 240-FI90-50/5.

122.     On UL's website regarding Fire Extinguisher Testing and Certification, they state that "The UL Mark on a fire extinguisher, as well as on fire extinguisher components and agents, is widely recognized to indicate that they meet the standards for safety and performance."

123.     Defendants are making false, and misleading statements to consumers about the UL testing of their product to deceive them about the product's safety and reliability.

*FALSE CLAIM OF ECO FRIENDLY TESTING*

124.    The ATG sales brochure states that its FIRESTORM XT 20 oz Aerosol is "deemed environmentally benign by the EPA and USDA. FIRESTORM has been tested by the U.S. Forest Service and is classified as non-toxic to mammals, aquatic, and terrestrial species."

125.    The Safety and Data Sheet for "FIRESTORM XT" that is advertised on ATG's Website states in Section 12.1 that "no negative or toxic effects on the environment are anticipated when released in dilution for terrestrial and aquatic ecosystems; based on government testing."

126.    The above statements are misleading and upon information and belief, the above statements are literally false.

127.    Upon information and belief, "FIRESTORM" has not undergone any testing by the EPA, USDA, U.S. Forest Service, or other "government testing."

128.    Upon information and belief, the agent in "FIRESTORM" has not undergone any testing by the EPA, USDA, the U.S. Forest Service, or other "government testing."

129.    The U.S. Forest Service conducts rigorous testing of products and has its own manufacturer submission procedures for qualification testing of wildland fire chemical products. This is important as the USDA Forest service policy requires that the agency only use evaluated, approved, and qualified chemicals.

130.    When submitting a product for testing to the U.S. Forest Service, the entity submitting the product and paying the costs of the evaluation is the only entity that may benefit from the results of the evaluation.

131.    In fact, the U.S. Forest Service will not acknowledge that a submitted formulation is similar to or the same as a product submitted by another. Testing of each product will proceed independently of products submitted by any other company.

132.    Mr. Reger's FIREICE has been tested by the U.S. Forest Service and is classified as non-toxic to mammals, aquatic, and terrestrial species. Mr. Reger's FIREICE is a part of the U.S. Forest Service's list of qualified products with the approved classifications and application methods.

133.    The evaluation and approval of the U.S. Forest Service to FIREICE belongs solely to Mr. Reger, and neither Mr. Cordani nor ATG is permitted to use FIREICE's evaluation and approval as its own.

### *FALSE CLAIMS REGARDING SOIL MD*

134.    Defendants' "SOIL MD" Granular is a copy of Mr. Reger's SOIL2O granular.

135.    Similar to Defendants using the research and testing information for Mr. Reger's FIREICE, Defendants are doing the same thing with Mr. Reger's SOIL2O granular by engaging in false advertising of its "SOIL MD" product, making statements concerning its efficiency and safety without conducting its own research and testing to substantiate such statements.

136.    Defendants claim that "SOIL MD" can reduce irrigation needs, and that there is "up to 30-50% reduction in irrigation needs saving both water and money."

137.    Defendants claim that "SOIL MD" is "safe for kids, pets, and the environment," that it is "eco friendly," and it is compatible with all types of soil and vegetation.

138.    Defendants' claims about "SOIL MD" in the preceding Paragraphs are misleading.

139.    Upon information and belief, Defendants' claims about "SOIL MD" in the preceding Paragraphs are literally false.

### *COLLUSION AND COORDINATION AMONG DEFENDANTS*

140.    Peter Cordani has colluded with his son Logan Cordani and Daniels ("the Individual Defendants") to engage in all of the fraudulent and unlawful activity describe above.

141.    Knowing that ATG was subject to liability for these wrongful acts, the Individual Defendants administratively dissolved ATG right before the litigation, and then opened various new companies; namely, GelTech  Labs Corporation ("GTL"), Dyno Tech Laboratories Corp ("Dyno Labs"), Dynomat Inc. ("Dyno Inc."),Whale Tank Ventures Inc. ("Whale"), and Logan's Wipe Magic, Inc. ("LWM") (collectively "Sham Companies").

142.    The Sham Companies either exist today, or existed at some point in time, as a vehicle to fraudulently avoid liability and to collect revenue from the business that holds itself out as All Things Gel. When a litigation threat is raised against any of the Sham Companies, that company dissolves and the Individual Defendants direct the revenue to a different Sham Company.

143.    The Individual Defendants are all owners, managers, and/or employees in the Sham Companies, and they identify the same principal address and contact information for each of the Sham Companies.

144.    For example, the form Non-Disclosure Agreement for Dyno Labs lists the contact as P.cordani@atg-labs.com.

145.    Each of Cordani, L. Cordani, and Mark Daniels control the Defendant corporations through various degrees of ownership interest, and as owners did direct and control the sales through these various companies, and marshalled all the revenue from these various sham corporations  through one website, atg_labs.com.


**COUNT I – FALSE ADVERTISING**
**Lanham Act Violation, 15 U.S.C. § 1125(a)**
_**(Mr. Reger and MLR against Defendants)**_

146.    The Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 145 as if fully set forth herein.

147.    This section will refer to the acts of "ATG," which should be read to include all Individual Defendants, who actively directed the unlawful conduct described herein, and against all Sham Companies, which are "mere continuations" of ATG.

148.    ATG did, and continues, to advertise its "FIRESTORM" and "SOIL MD" products for sale in interstate commerce.

149.    ATG engages in commercial speech for the purpose of influencing consumers to buy its products. ATG's commercial speech includes, but is not limited to, its statements on its Website, its Brochures and its Safety and Data Sheets, banners, and posters ("Advertising").

150.    ATG's Advertising is provided and disseminated to the purchasing public in an attempt to affect the consumer's buying decisions.

151.    ATG's Advertising claims made regarding its "FIRESTORM XT" 20 oz Aerosol and "SOIL MD" are false and misleading.

152.    ATG's claims regarding customer testimonials are false and misleading.

153.    ATG's claims are likely to deceive or confuse a substantial segment of the buying public.

154.    ATG's deceptive conduct is and has been willful and deliberate, and has injured and continues to injure Mr. Reger, MLR, and consumers.

155.    ATG knows or should know that the claims it is making regarding its customer testimonials and "FIRESTORM XT" 20 oz Aerosol and "SOIL MD" are false and misleading.

156.    ATG's Advertising violates Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

157.    Mr. Reger and MLR have been, and will continue, to be damaged by ATG's false advertising, including through direct diversion of sales from Plaintiffs to ATG.

**WHEREFORE**, Mr. Reger and MLR respectfully request that the Court enter judgment against Defendants as follows:

A.  An Order adjudging that Defendants have violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);

B.  An Order preliminarily and permanently enjoining Defendants and their officers, agents, employees, and all persons acting in concert or participation with them, from:

    i.  Making or disseminating, or causing the making or dissemination of, the Defendants' false and misleading claims, as alleged herein, including enjoining any advertising that uses the false and misleading claims, and any variations thereof;

    ii.  Effecting assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth herein;

C.  An Order requiring the Defendants to disseminate corrective advertising to correct the false and misleading impressions created among consumers by the false claims, as alleged herein;

D.  An Order requiring that the Defendants disgorge all profits from their sales as ATG was formed for the sole purpose to clone products of Mr. Reger and MLR, and divert such sales with misinformation and false information using past employees who are intimate with the sales, customers and vendors of Geltech;

E.  An Order requiring that Defendants recall ATG's products sold concerning its false advertising;

F.      An Order awarding Mr. Reger and MLR damages to the fullest extent allowed by law, including any lost profits sustained by the Plaintiffs which were caused by the Defendants' false advertising and/or the gains, profits, savings, and advantages the Defendants realized by reason of their false advertising;

G.      An Order trebling Mr. Reger and MLR's recovery pursuant to Section 35 of the Lanham Act, 15 U.S.C. §1117;

H.      An Order granting the Plaintiffs their costs and disbursements in this action, including its reasonable attorney's fees; and

I.      An Order granting Plaintiffs such other and further relief as this Court may deem just and proper.

### COUNT II – UNFAIR COMPETITION
### Lanham Act Violation, 15 U.S.C. § 1125(a)
### *(Mr. Reger and MLR against Defendants)*

158.    The Plaintiffs repeat and realleged each and every allegation contained in Paragrpahs 1 through 157 as if fully set forth herein.

159.    This section will refer to the acts of "ATG," which should be read to include all Individual Defendants, who actively directed the unlawful conduct described herein, and against all Sham Companies, which are "mere continuations" of ATG.

160.    ATG advertises itself as an authorized seller or distributor of FIREICE products.

161.    ATG engages in commercial speech for the purpose of influencing consumers to buy its products. ATG's commercial speech includes, but is not limited to, its website, its brochures, its marketing events, and its posters in its offices that are open and available to the public.

162.    ATG offers identical products as those offered by MLR.

163.   Defendants have engaged in a pattern of false and misleading activity designed to mislead the public into believing that they are associated with the trademarks and products offered by Mr. Reger and MLR. These include (1) the use of identical product packaging, (2) the use of similar names, (3) the use of posters bearing the FIREICE trademark, and (4) statements that ATG is the successor to Geltech.

164.   ATG's claims are likely to deceive or confuse a substantial segment of the buying public.

165.   Defendant ATG's use in commerce of Mr. Reger and MLR's Trademarks, as described herein for its advertising and promotion of services, without Mr. Reger and MLR's consent and/or authorization, constitutes unfair competition under § 1125(a) in that said conduct tends to falsely represent or designate that Defendant ATG's products and/or services is offered by, sponsored by, or otherwise affiliated with Mr. Reger and MLR's Trademarks and Intellectual Property, has caused, causes, and is likely to continue to cause consumer confusion, mistake or deception and to cause the relevant public to mistakenly believe that Mr. Reger and/or MLR offers, endorses, provides sponsors, is associated with, and/or is otherwise with Defendant ATG.

166.   ATG's infringing acts have been with full knowledge of Plaintiffs' rights in their Trademarks.

167.   At all times material, Defendant ATG directed, controlled, ratified, and/or participated in the unauthorized use and infringement of Plaintiff's' valuable Trademarks.

168.   ATG's deceptive conduct is and has been willful and deliberate, and has injured and continues to injure Mr. Reger, MLR, and consumers.

**WHEREFORE**, Mr. Reger and MLR respectfully request that the Court enter judgment against Defendants as follows:

A.      An Order adjudging that the Defendants have violated Section 43(a) of the Lanham Act,15 U.S.C. § 1125(a);

B.      An Order preliminarily and permanently enjoining the Defendants and their officers, agents, employees, and all persons acting in concert or participation with them, from:

      i.      Making any statement or representation whatsoever, or using any false designation of origin or false description, or performing any act, which can or is likely to lead the trade or public, or individual members thereof, to believe that any products manufactured, distributed, or sold by Defendants is in any manner associated or connected with Plaintiffs and/or the FireIce® mark, or are sold, manufactured, licensed, sponsored, approved, or authorized by Plaintiffs;

     ii.      Effecting assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth herein;

C.      An Order requiring the Defendants to disseminate corrective advertising and/or statements to correct the false and misleading impressions created among consumers and vendors by the false claims, as alleged herein;

D.      An Order requiring that the Defendants disgorge all profits from ATG's sales as ATG was formed for the sole purpose to clone products of Mr. Reger and MLR, and divert such sales with misinformation and false information using past employees who are intimate with the sales, customers and vendors of Geltech;

E.      An Order requiring that Defendants recall their products sold concerning its false and misleading advertising;

F.      An Order awarding Mr. Reger and MLR damages to the fullest extent allowed by law, including any lost profits sustained by the Plaintiffs which were caused by the Defendants' false advertising and statements of origin, and/or the gains, profits, savings, and advantages the Defendants realized by reason of their deceptive and misleading conduct;

G.      An Order trebling Mr. Reger and MLR's recovery pursuant to Section 35 of the Lanham Act, 15 U.S.C. §1117;

H.      An Order granting the Plaintiffs their costs and disbursements in this action, including its reasonable attorney's fees; and

I.      An Order granting Plaintiffs such other and further relief as this Court may deem just and proper.

## COUNT III – TRADEMARK INFRINGEMENT
### Lanham Act Violation, 15 U.S.C. § 1114(1)(a)
#### *(Mr. Reger against Defendants)*

169.    Mr. Reger repeats and realleges each and every allegation contained in Paragraphs 1 through 168 as if fully set forth herein.

170.    This section will refer to the acts of "ATG," which should be read to include all Individual Defendants, who actively directed the unlawful conduct described herein, and against all Sham Companies, which are "mere continuations" of ATG.

171.    Defendants' use in commerce of Mr. Reger's FIREICE trademark without Mr. Reger's consent and/or authorization, constitutes an infringement of Mr. Reger's trademark in violation of 15 U.S.C. § 1114(1), in that said conduct has caused confusion, mistake or deception, and is likely to continue to cause confusion, misstate, or deception, and to cause the relevant public to mistakenly believe that Mr. Reger endorses, sponsors, is associated with, and/or is otherwise affiliated with Defendants.

172.    Defendants' use of the marks "FIRESTORM", "SOIL MD", and Geltech without Mr. Reger's consent and/or authorization, constitutes an infringement of Mr. Reger's FIREICE, SOIL2O, and GELTECH SOLUTIONS trademarks in violation of 15 U.S. C. § 1114(1), in that said conduct has caused confusion, mistake or deception, and is likely to continue to cause confusion, misstate, or deception, and to cause the relevant public to mistakenly believe that Mr. Reger endorses, sponsors, is associated with, and/or is otherwise affiliated with ATG.

173.    ATG's infringing acts have been with full knowledge of Mr. Reger's rights in his trademarks.

174.    At all times material, Defendants directed, controlled, ratified, and/or participated in the unauthorized use and infringement of Mr. Reger's valuable trademarks.

175.    Defendants' conduct is willful and reflects an intent to exploit the goodwill and strong brand recognition associated with the trademarks.

176.    Through the unauthorized use of Mr. Reger's trademarks, Defendants are unfairly benefiting from and misappropriating Mr. Reger's goodwill and reputation, as well as the fame of the trademarks.  This has resulted in substantial and irreparable injury to the public and to Mr. Reger.

177.    Defendants' acts have caused, and will continue to cause, irreparable injury to Mr. Reger.  Mr. Reger has no adequate remedy at law and is thus damaged in an amount not yet determined.

**WHEREFORE**, Mr. Reger respectfully requests that the Court enter judgment against ATG as follows:

A.    An Order adjudging that the Defendant has violated Section 32(1)(a) of the Lanham Act, 15 U.S. C. § 1114(1);

B.      An Order preliminarily and permanently enjoining the Defendants and their officers, agents, employees, and all persons acting in concert or participation with it in any manner, form, medium, and/or fashion, from:

      i.      Using Mr. Reger's FIREICE, SOIL2O, or GELTECH SOLUTIONS trademarks or any other reproduction, counterfeit, copy or imitation of the trademarks, including use of "FIRESTORM", "SOIL MD", "GELTECH LABS", and "GTL" on or in connection with any goods or services, or in connection with the promotion, advertisement, display, sale, offer for sale, manufacture, production, importation, circulation, or distribution of any products;

      ii.      Destroying, altering, removing, or otherwise dealing with unauthorized products or any books or records which contain any information relating to the importation, manufacture, production, distribution, circulation, sale, marketing, offer for sale, advertising, promotion, rental or display of all products which infringe Mr. Reger's trademarks;

      iii.      Effecting assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth herein;

C.      For the entry of an Order directing Defendants to deliver up for destruction to Mr. Reger all products, advertisements, promotional materials, and packaging in its possession or under its control bearing the FIREICE, SOIL2O, or GELTECH SOLUTIONS trademark, or any simulation, reproduction, counterfeit, copy or imitation thereof pursuant to 15 U.S.C. §1118;

D.      An Order awarding Mr. Reger damages to the fullest extent allowed by law, including any lost profits sustained by the Plaintiffs which were caused by the Defendants' false advertising and/or the gains, profits, savings, and advantages the Defendants realized by reason of their infringement;

E.      An Order trebling Mr. Reger's recovery pursuant to Section 35 of the Lanham Act, 15 U.S.C. §1117;

F.      An Order granting the Plaintiffs their costs and disbursements in this action, including its reasonable attorney's fees; and

G.      An Order granting Plaintiffs such other and further relief as this Court may deem just and proper.

## COUNT IV - MISAPPROPRIATION OF TRADE SECRETS
## 18 U.S.C. §§ 1832 AND 1836)

### *(Mr. Reger and MLR against All Defendants)*

178.    Mr. Reger repeats and realleges each and every allegation contained in Paragrpahs 1 through 177 as if fully set forth herein.

179.    This section will refer to the acts of "ATG," which should be read to include all Individual Defendants, who actively directed the unlawful conduct described herein, and against all Sham Companies, which are "mere continuations" of ATG.

180.    Defendants' conduct constitutes a misappropriation of trade secrets under the Defend Trade Secrets Act, codified at 18 U.S.C. §§ 1836 and 1839.

181.    Mr. Reger and his licensee, MLR, have an advantage in trade competition over MLR's competitors by virtue of the Geltech customer list, the identity of Geltech's manufacturer, Geltech's relationship with its Manufacturer, the propriety formulas developed by the Manufacturer for Geltech's exclusive use, and other trade secrets.

182.     Geltech transferred the trade secrets to Mr. Reger, who exclusively licenses them to MLR.

183.     These trade secrets are not generally known by others in the industry nor are they readily ascertainable by an independent investigation.

184.     Geltech kept, and Mr. Reger and MLR continue to keep, this information secret.

185.     Mr. Cordani acquired the trade secrets "under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use the of the trade secret …" 18 U.S.C. § 1839(5)(b)(ii)(II). Namely, Geltech hired Mr. Cordani to be its Chief Technology Officer.

186.     However, Mr. Cordani and the other Defendants used the trade secrets to solicit customers and develop a competing product.

187.     Plaintiffs have been damaged by the misappropriation of their trade secrets by losing customers.

188.     Because the future harm caused by Mr. Cordani's ongoing use of Plaintiffs' trade secrets is not fully quantifiable, Plaintiffs have no adequate remedy at law to his continued possession or use of the trade secrets. Mr. Cordani's conduct has caused, and if not enjoined will continue to cause, irreparable damage to Plaintiffs. Accordingly, Plaintiffs are entitled to injunctive relief.

**WHEREFORE**, Mr. Reger and MLR respectfully requests that the Court enter judgment against Mr. Cordani as follows:

A.      An Order adjudging that the Defendant has violated 18 U.S.C. §§ 1836 and 1839;

B.      An Order preliminarily and permanently enjoining the Defendants and their officers, agents, employees, and all persons acting in concert or participation with them in any manner, form, medium, and/or fashion, from:

     i.     Using Mr. Reger's customer lists, soliciting Geltech's former customers, engaging in any relationship with the Manufacturer, and continuing to manufacture, sell or distribute any products containing the trade secret formulations and polymers produced by the Manufacturer for Geltech;

     ii.     Destroying, altering, removing, or otherwise dealing with unauthorized products or any books or records which contain any information relating to the importation, manufacture, production, distribution, circulation, sale, marketing, offer for sale, advertising, promotion, rental or display of all products which misappropriate Mr. Reger's trade secrets;

     iii.     Effecting assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth herein;

C.     For the entry of an Order directing Defendants to deliver up for destruction to Mr. Reger all products made by the Manufacturer, or using the trade secret formulations and polymers produced by the Manufacturer for Geltech;

D.     An Order awarding Mr. Reger damages to the fullest extent allowed by law, including any lost profits sustained by the Plaintiffs which were caused by the Defendants' misappropriation of trade secrets;

E.     An Order for exemplary damages due to Defendants' willful and malicious misappropriation;

F.     An Order granting the Plaintiffs their costs and disbursements in this action, including its reasonable attorney's fees; and

G.      An Order granting Plaintiffs such other and further relief as this Court may deem just and proper.

## COUNT V - MISAPPROPRIATION OF TRADE SECRETS
### Florida Uniform Trade Secrets Act – §688, Fla. Stat.

### *(Mr. Reger and MLR against All Defendants)*

189.      Mr. Reger repeats and realleges each and every allegation contained in Paragrpahs 1 through 188 as if fully set forth herein.

190.      This section will refer to the acts of "ATG," which should be read to include all Individual Defendants, who actively directed the unlawful conduct described herein, and against all Sham Companies, which are "mere continuations" of ATG.

191.      Defendants' conduct constitutes a misappropriation of trade secrets under the Florida Uniform Trade Secrets Act, codified at §688.001, et seq., Fla. Stat.

192.      Mr. Reger and his licensee, MLR, have an advantage in trade competition over MLR's competitors by virtue of the Geltech customer list, the identity of Geltech's manufacturer, Geltech's relationship with its Manufacturer, the propriety formulas developed by the Manufacturer for Geltech's exclusive use, and other trade secrets.

193.      Geltech transferred the trade secrets to Mr. Reger, who exclusively licenses them to MLR.

194.      These trade secrets are not generally known by others in the industry nor are they readily ascertainable by an independent investigation.

195.      Geltech kept, and Mr. Reger and MLR continue to keep, this information secret.

196.      However, Mr. Cordani and the other Defendants used the trade secrets to solicit customers and develop a competing product.

197.     Plaintiffs have been damaged by the misappropriation of their trade secrets by losing customers.

198.     Because the future harm caused by Mr. Cordani's ongoing use of Plaintiffs' trade secrets is not fully quantifiable, Plaintiffs have no adequate remedy at law to his continued possession or use of the trade secrets. Mr. Cordani's conduct has caused, and if not enjoined, will continue to cause, irreparable damage to Plaintiffs. Accordingly, Plaintiffs are entitled to injunctive relief.

**WHEREFORE**, Mr. Reger and MLR respectfully requests that the Court enter judgment against Mr. Cordani as follows:

A.      An Order adjudging that the Defendant has violated the Florida Uniform Trade Secrets Act;

B.      An Order preliminarily and permanently enjoining the Defendants and their officers, agents, employees, and all persons acting in concert or participation with them in any manner, form, medium, and/or fashion, from:

i.     Using Mr. Reger's customer lists, soliciting Geltech's former customers, engaging in any relationship with the Manufacturer, and continuing to manufacture, sell or distribute any products containing the trade secret formulations and polymers produced by the Manufacturer for Geltech;

ii.     Destroying, altering, removing, or otherwise dealing with unauthorized products or any books or records which contain any information relating to the importation, manufacture, production, distribution, circulation, sale, marketing, offer for sale, advertising, promotion, rental or display of all products which misappropriate Mr. Reger's trade secrets;

iii.    Effecting assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth herein;

C.    For the entry of an Order directing Defendants to deliver up for destruction to Mr. Reger all products made by the Manufacturer, or using the trade secret formulations and polymers produced by the Manufacturer for Geltech;

D.    An Order awarding Mr. Reger damages to the fullest extent allowed by law, including any lost profits sustained by the Plaintiffs which were caused by the Defendants' misappropriation of trade secrets;

E.    An Order for exemplary damages due to Mr. Cordani's willful and malicious misappropriation;

F.    An Order granting the Plaintiffs their costs and disbursements in this action, including its reasonable attorney's fees; and

G.    An Order granting Plaintiffs such other and further relief as this Court may deem just and proper.

## COUNT VI: BREACH OF FIDUCIARY DUTY
### (Mr. Reger against Mr. Cordani)

199.    Mr. Reger repeats and realleges each and every allegation contained in Paragrpahs 1 through 198 as if fully set forth herein.

200.    Given his duties to and his special relationship with Geltech, Mr. Cordani owed Geltech a fiduciary duty.

201.    Geltech placed Mr. Cordani in a position of trust and confidence by granting him access to its highly confidential, protected trade secrets and other information, so that he could perform his functions for Geltech. At all times, Mr. Cordani understood the economic and exploitive value of that confidential information and that misappropriation thereof would injure and damage Geltech and any successor.

202.    Mr. Cordani acted as an employee that performed specialized functions for Geltech, and who was authorized to communicate with suppliers, vendors, and customers. As such, he was Geltech's agent.

203.    As Geltech's agent, Mr. Cordani owed Geltech (1) a duty of loyalty and utmost good faith; (2) a duty to refrain from self-dealing; (3) a duty to act with integrity of the strictest kind; (4) a duty of fair, honest dealing; and (5) a duty of full disclosure.

204.    Mr. Cordani breached his duties of loyalty and good faith dealing owed to Geltech by unlawfully appropriating and mis-using Geltech's trade secrets and other confidential, proprietary assets, including but not limited to the Geltech customer list, the identity of Geltech's manufacturer, Geltech's relationship with its Manufacturer, and the propriety formulas developed by the Manufacturer for Geltech's exclusive use for his personal profit and commercial exploitation in developing competing products for a competing business, and by soliciting Geltech's manufacturer and customers, and by diverting business opportunities away from MLR, both directly and as controlling person of ATG and GTL.

205.    By virtue of the Settlement Agreement, Mr. Reger owns the causes of action and all rights of recovery and relief for Mr. Cordani's breaches of fiduciary duty to Geltech, and in turn, to Mr. Reger and his exclusive licensee MLR, as he acquired ownership of those trade secrets and other confidential, proprietary assets of Geltech through the Settlement Agreement.

206.     Mr. Cordani's breaches have directly injured and damaged Mr. Reger by unlawfully causing MLR's customers to purchase competing product offered by ATG and/or GTL.

**WHEREFORE**, Mr. Reger and MLR respectfully requests that the Court enter judgment against Mr. Cordani as follows:

A.       An Order awarding Mr. Reger damages to the fullest extent allowed by law, including disgorgements of any lost profits sustained by the Plaintiffs which were caused by the Defendant's breaches of fiduciary duty;

B.       An Order for enhanced damages as allowed by law;

C.       An Order granting the Plaintiffs their costs and disbursements in this action, including its reasonable attorney's fees; and

D.       An Order granting Plaintiffs such other and further relief as this Court may deem just and proper.

## COUNT VII – UNFAIR TRADE PRACTICES
### Florida Deceptive and Unfair Trade Practices Act Violation, §§ 501.201-212, Fla. Stat.
### *(Mr. Reger and MLR against All Defendants)*

207.     The Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 206 as if fully set forth herein.

208.     The Defendants are not authorized to promote, sell, or otherwise represent any affiliation with any of the Plaintiffs' products, including, but not limited to, the Plaintiffs' FireIce® products and trademark.

209.     The Defendants' products have not undergone the requisite testing or certification approval for the Defendants to claim that their products are comparable to the Plaintiffs' products, or have the same qualities, certifications, and approvals as Plaintiffs have for their products.

210.    The Defendants' promotion, advertisement, or offering of the products is unfair competition and constitutes a deceptive act or trade practices in violation of Florida's Deceptive and Unfair Trade Practices Act.

211.    Defendants' unauthorized use of Mr. Reger's FIREICE trademark, and false advertising, in conjunction with its services provided to reasonable consumers is unfair, deceptive, immoral, unethical, oppressive, unscrupulous and substantially injurious in that:

a.    it creates the false, deceptive and misleading impression that Mr. Reger, MLR or the FIREICE brand is associated with, sponsors, offers, endorses, or is otherwise affiliated with Defendants' services, and endorses or provides such products to Defendants;

b.    it dilutes, blurs, and tarnishes Mr. Reger, MLR and the FIREICE trademark's highly regarded, famous, and renowned name and reputation in the community and industry;

c.    it deceives and confuses consumers into believing that the advertising statements made regarding testing, approval, and certifications are valid providing false credibility and assurance to customers by life safety products that are highly regulated; and

d.    it causes and is likely to continue to cause confusion, deception, and/or mistake on the part of the public and reasonable consumers.

212.    The Defendants have acted willfully, intentionally, and deliberately in derogation of the Plaintiffs' rights.

213.    At all times material, Defendants directed, controlled, ratified, and/or participated in these unfair, deceptive, immoral, unethical, oppressive, unscrupulous and substantially injurious acts or practices.

214.     As a direct and proximate result of Defendants' unfair, deceptive, immoral, unethical, oppressive, unscrupulous and substantially injurious acts or practices, the Plaintiffs have and will continue to suffer damages.

215.     Plaintiffs are entitled to injunctive relief pursuant to Section 501.211(1), Florida Statutes, to prevent future injury to its reputation and its mark, and to prevent consumer deception and confusion.

**WHEREFORE**, Plaintiffs respectfully requests that this Court enter judgment against Defendants for the following:

A.     Preliminarily and permanently enjoining Defendants and their officers, agents, servants, employees and all persons acting in concert or participation with it from using, in any manner, form, medium, and/or fashion, the FIREICE trademark, for and/or in connection with its Advertising or services for any other purpose, and from infringing the FIREICE trademark, or using any names or marks confusingly similar thereto;

B.     Award Mr. Reger and MLR damages to the fullest extent allowed by law, including any lost profits sustained by the Plaintiffs which were caused by the Defendants' false advertising and infringement, and/or the gains, profits, savings, and advantages the Defendants realized by reason of their fraudulent and deceptive conduct;

B.     Award attorney's fees and costs to Plaintiffs' counsel as provided for under Section 501.2105, Florida Statutes; and

C.     Provide such other relief as may be proper.

## COUNT VIII – BREACH OF EMPLOYMENT AGREEMENT
### *(Mr. Reger against Cordani)*

216.     The Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 215 as if fully set forth herein.

217.     Mr. Cordani executed an employment agreement on October 1, 2012, with Geltech ("Employment Agreement"). A true and correct copy of that Employment Agreement is attached as Exhibit A.

218.     In the Employment Agreement, in exchange for his employment as Geltech's Chief Technology Officer and a generous salary, Mr. Cordani agreed, *inter alia,* to valid and enforceable restrictive covenants that prohibited him from engaging in anti-competitive actions.

219.     Pursuant to Paragraph 8(a), Mr. Cordani agreed not to compete with Geltech for a period of one year following his termination in geographic areas in which Geltech had customers.

220.     However, immediately following his departure from Geltech, Mr. Cordani opened ATG, a directly competitive business, soliciting customers in Geltech's precise geographic markets. Such action constituted a breach of the Employment Agreement.

221.     Pursuant to Paragraph 8(b), Mr. Cordani agreed not to solicit Geltech's customers for a period of one year following his termination.

222.     However, immediately following his departure from Geltech, Mr. Cordani opened ATG, a directly competitive business, soliciting Geltech's customers. Such action constituted a breach of the Employment Agreement.

223.     Pursuant to Paragraph 9(c), Mr. Cordani agreed not to use for his own benefit or disclose any of Geltech's confidential information.

224.     However, immediately following his departure from Geltech, Mr. Cordani used for his own personal benefit Geltech's customer list, the identity of Geltech's manufacturer, Geltech's

relationship with its Manufacturer, and the propriety formulas developed by the Manufacturer for Geltech's exclusive use. Such action constituted a breach of the Employment Agreement.

225.    By violating Paragraphs 8(a), 8(b), and 9(b) of the Employment Agreement, Mr. Cordani breached the Employment Agreement.

226.    The Employment Agreement inured to the benefit of Geltech's successors, defined as successors the acquired "all or substantially all of the securities or assets and business" of Geltech.

227.    Therefore, the Employment Agreement inures to the benefit of, and is enforceable by, Mr. Reger.

**WHEREFORE**, Mr. Reger and MLR respectfully requests that the Court enter judgment against Mr. Cordani as follows:

A.  An Order declaring that Mr. Cordani has breached his Employment Agreement

B.  An Order requiring Mr. Cordani to terminate relationships with the Manufacturer, to terminate relationships with all Geltech former customers, to cease all manufacture, sales, and marketing of products made by the Manufacturer or manufactured by utilizing Mr. Reger's confidential information; and

C.    An Order for attorney's fees, as required by the Employment Agreement.


## COUNT IX – COPYRIGHT INFRINGEMENT
### *(Mr. Reger and MLR against All Defendants)*

228.    The Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 227 as if fully set forth herein.

229.    Mr. Reger owns all title and interest in its copyright protected visual work.

230.    On information and belief, Defendants have reproduced, displayed, and prepared derivative works of the poster that infringe on Mr. Reger's copyrighted work.

231.    Defendant's actions violate Mr. Reger's exclusive rights as provided by 17 U.S.C. § 106.

232.    On information and belief, Defendants have willfully, intentionally, and deliberately infringed on Mr. Reger's copyrighted visual work.

233.    In accordance with 17 U.S.C. § 504, Mr. Reger is entitled to recover the actual damages suffered as a result of the infringement, and any profits of the infringement, and profits of the infringer that are attributable to the infringement.

234.    Mr. Reger is entitled to a permanent injunction pursuant to 17 U.S.C. § 502 preventing Defendants from copying, manipulating, reproducing, distributing, selling, or displaying any infringing or derivative works.

**WHEREFORE**, Mr. Reger and MLR respectfully request that the Court enter judgment against Mr. Cordani as follows:

A. An Order declaring that Mr. Cordani has reproduced, displayed, and prepared derivative works of the copyrighted work;

B. An Order requiring all Defendants should be preliminarily and permanently enjoined from marketing or selling any product containing all or any portion of or derived from Mr. Reger's copyrighted visual work; and

C. An Order for all damages and costs suffered as a result of the copyright infringement, and any profits of the infringement, and any profits attributable to the infringement.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiffs demand trial by jury in this action of all issues so triable.

Dated: November 15, 2022.

/s/ Amanda G. Hyland
Amanda G. Hyland
Georgia Bar No. 37554
**TAYLOR ENGLISH DUMA LLP**
1600 Parkwood Circle, Suite 400
Atlanta, Georgia 30339
Telephone: (770) 434 6868
Fax: (404) 434-7376
Email:   ahyland@taylorenglish.com